Richard A. BANKS, Plaintiff,

v.

William L. BALL, III, Secretary of the Navy, Defendant.

Civ. A. No. 86–0923–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 1, 1989.

Roger J. Nichols, Los Angeles, Cal., Penrose Lucas Albright, Arlington, Va., for plaintiff.

Commander Richard S. Walsh, JAGC, USN, Office of the Judge Advocate Gen. of the Navy, Gen. Litigation Div., Dept. of the Navy, Dennis E. Szybala, Asst. U.S. Atty., Alexandria, Va., for defendant.

MEMORANDUM OPINION

CACHERIS, District Judge.

This matter is before the court on the plaintiff's Complaint seeking a declaratory judgment that Article 1149 of Navy Regulations be declared unconstitutional in violation of the First Amendment and be declared not applicable to the plaintiff, Richard A. Banks ("Banks") as a Naval reservist.[1] Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure defendant moves for dismissal of plaintiff's action on the grounds that upon the facts and the law plaintiff has shown no right to relief.[2] For the reasons set forth below, the defendant's Motion is granted.

I

The court adopts the party's Stipulation of Uncontested Facts and in addition finds the other relevant facts to be as follows:

Plaintiff, Richard A. Banks, ("Banks") served on active duty as a Naval aviator, commencing in December, 1966 and continuing until December, 1971. Following his tour of extended active duty, plaintiff

---

1. This case was transferred on August 1, 1986 from the United States District Court for the District of Columbia to the United States District Court for the Eastern District of Virginia.

2. On July 29, 1988 this court dismissed plaintiff's claim under the Privacy Act 5 U.S.C. § 552a(e)(7). On October 27, 1988 this court dismissed the plaintiff's claim under the Little Tucker Act 28 U.S.C. § 1346(a)(2).

continued to serve as a Naval aviator in the U.S. Naval Reserve. Plaintiff's Naval record includes 126 missions of combat flying during the Vietnam War. (Plaintiff's Proposed Findings of Fact ¶ 1).

The defendant, William L. Ball, III, is the Secretary of the Navy and is being sued in his official capacity.[3] However, during all periods material to this case, the Secretary of the Navy was John F. Lehman ("Lehman"). (Lehman Dep. at 6).

Effective July 25, 1983 Banks assumed command of VFA–303. His assignment was approved by the Commander of the Naval Reserve Forces, Rear–Admiral T.F. Rinard, United States Naval Reserve ("Rinard"). (Stip. of Fact ¶ 3, Plaintiff's Exh. 1, Testimony of Rinard).

VFA–303 was designated as the first Naval Reserve Aviation Squadron to receive the new F/A–18 Hornet ("Hornet") aircraft. (Lehman Dep. at 18, Testimony of Banks).

The transition to allow Naval Reserve Squadrons to use new aircraft like the Hornet was a part of the Navy's "Horizontal Integration, [program] which was to modify the reserve forces with the latest equipment so they could both mobilize immediately and bear the peacetime burden on a day-to-day basis with active forces." (Lehman Dep. at 9, Testimony of Banks, Testimony of Rinard).

Banks was initially informed that the new Hornet aircraft would be delivered in April, 1984. The April delivery date was subsequently changed to June of 1984. (Testimony of Banks).

The delay in delivery was occasioned by the opposition of a Senate Arms Service Committee staffer, Carl Smith, to any Naval Reserve squadrons receiving Hornets prior to the active duty units. (Lehman Dep. at 20–21).

As of December, 1983 Banks had heard rumors that the planned delivery of the Hornets to the reserve units was to be cancelled. (Defendant's Exh. K).

In late December, 1983 Banks discussed his concern about the rumors with his immediate superior, Captain Thomas B. Latendresse, U.S.N. Commander, Carrier Air Wing Reserve THIRTY. Banks discussed the possibility of sending letters about his concern to members of Congress. Latendresse told him to give it a try, but he also told him to "be careful." (Testimony of Banks).

In December, 1983 Banks forwarded an official letter to the Secretary of the Navy via his chain of command expressing his concerns. Banks' letter was returned to him by Rear Admiral Rinard for the inclusion of additional addresses. The letter was corrected and sent out again. Banks never received a reply from the Secretary. (Defendant's Exh. A at 3, Testimony of Rinard).

In late December, 1983 or early January, 1984 Banks called Rinard regarding the delays in receiving the Hornets. Rinard assured Banks that his squadron's training schedule, to prepare for receipt of the aircraft, was still on track. However, Rinard informed Banks that there were some uncertainties as to when Banks' squadron would be receiving the new Hornets. Banks discussed the idea of writing members of Congress with Rinard. Rinard advised Banks that he could write as a private citizen or use a procedure through the Navy chain of command. Rinard counselled Banks against writing in his official capacity. (Testimony of Rinard, Defendant's Exh. A at 4).

Commander Banks drafted the letters dated January 6, 1984 to members of Congress. Certain VFA–303 military personnel prepared one copy for each of the twelve to fifteen members of the House of Representatives and Senate Armed Services Committees. Commander Banks authorized one of his subordinate officers in the squadron to sign his name to the letters and to mail them. Although Commander Banks did not personally sign the letters, he does not deny and assumes full respon-

---

**3.** The action as originally filed also named the Secretary in his individual capacity. Plaintiff's Complaint was subsequently amended naming the Secretary as a party only in his official capacity.

sibility for their issuance. (Testimony of Banks; Stip. of Fact ¶'s 4, 5; Defendant's Exh. A at 5).

The letters, addressed to the members of Congress, were typed on official Navy letterhead. The letter began: "As the Commanding Officer of Strike Fighter Squadron THREE ZERO THREE I would like to draw your attention to the possibility that the current planned transition of this command to the F/A–18 aircraft is in jeopardy." Through the letters Banks was attempting to point out what he saw as a problem and obtain support from Congress. In addition, Banks included his home and office telephone numbers, volunteered his presence in Washington if the congressmen deemed it necessary, and signed the letter "R.A. Banks, Commanding Officer." (Defendant's exhibit I).

Banks also urged other members of his Squadron to write letters to Congressmen. (Defendant's Exh. A at 5, Defendants Exh. K).

One of the letters had been addressed to Congressman William Whitehurst of Virginia who subsequent to receiving the letter contacted the Secretary of the Navy. A Captain Jerry Palmer contacted Banks and informed him that his letter had "created a hornet's nest and the Secretary of the Navy is pissed." (Testimony of Banks, Defendant's Exh. I).

Copies of the letters were received by Rear Admiral Rinard and Vice Admiral Kempf ("Kempf"). (Testimony of Rinard, Testimony of Kempf).

Rinard determined that Banks had violated Navy regulations by sending his letter to the congressmen and ignored the advice that he had given him in late December, 1983 or early January, 1984 to not send the letters in his official capacity. (Testimony of Rinard; Defendant's Exh's. M, O).

Rinard had the authority to direct the reassignment of an officer in a command billet. (Stip. of Fact ¶ 3, Testimony of Rinard). On January 24, 1984 Rinard called Banks and advised him that because of the letter writing he was transferred to a voluntary (non-paying) training unit in Alameda, California. Rinard felt that the letters had created a controversy but it did not warrant relieving Banks of command. (Testimony of Banks, Plaintiff's Exh. 4, Defendant's Exh. A at 6).

Rinard's decision to reassign Banks from Squadron Commander of VFA–303 to a voluntary training unit was an administrative decision and not punitive action. Rinard was disappointed with Banks because he had acted contrary to his instructions and felt that Banks would not follow other orders. (Testimony of Rinard, Defendant's Exh. O).

Prior to reassigning Banks, Rinard discussed his proposed action with Admiral Kempf. Admiral Kempf did not direct the action that Rinard should take but discussed the proposed reassignment with Secretary Lehman. Lehman had no objection to the proposed action. (Testimony of Rinard, Lehman Dep. at 32–34).

In March, 1984 Rinard initiated and executed an adverse fitness report on Banks. He stated in the comment section that he was transferring Banks due to his violation of Article 1149 of the Navy Regulations. Rinard assigned Banks low grades in judgment, organizational support, and desirability for command. (Defendant's Exh. M, Testimony of Rinard).

Secretary Lehman did not direct the preparation of the fitness report on Banks. (Testimony of Lehman, Lehman Dep. at 31–32, Testimony of Rinard).

Secretary Lehman did not give his approval to Banks' letter. (Lehman Dep. at 47).

On January 10, 1986 the adverse fitness report was removed from plaintiff's records. (Defendant's Exh. Z). The Naval Investigative Service has conducted an investigation of the entire letter writing incident. (Plaintiff's Exh. 18).

II

This case presents itself as a Motion to Dismiss Pursuant to Rule 41(b) of the Fed-

eral Rules of Civil Procedure.[4]

Rule 41(b) expressly authorizes a motion for dismissal by a defendant after the plaintiff has completed the presentation of his evidence on the grounds that upon the facts and the law, the plaintiff has shown no right to relief. Rule 41(b) states in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all evidence.

In deciding a motion for involuntary dismissal under Rule 41(b), the court is free to weigh the evidence and pass on the credibility of witnesses, which it may not do when deciding whether or not to grant a motion for a directed verdict in a jury case. Rule 41(b) requires a court rendering judgment on the merits against the plaintiff to make findings as provided in Rule 52(a) of the Federal Rules of Civil Procedure.

The Fourth Circuit has held that Rule 41(b):

> requires the judge, as the trier of fact, to weigh and consider all of the evidence, and he may sustain the motion even though the plaintiff may have presented a *prima facie* case.

*Holmes v. Bevilacqua,* 794 F.2d 142, 147 (4th Cir.1986).

The court's review of this case is governed by the arbitrary and capricious standard. Under this standard in order to uphold the Secretary's action, the court must find that his action was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (1977). The Supreme Court in *Citizens to Preserve Overton*

*Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), clarified the court's review of agency decisions stating:

> Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its Judgment for that of the agency.

The D.C. Circuit in *Trans–Pacific Freight v. Federal Maritime Com'n,* 650 F.2d 1235, 1251, (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed. 2d 840 (1981), provided additional guidance in reviewing agency decisions stating that the reviewing court, after satisfying itself that the agency acted within its statutory authority and that the action was accompanied by appropriate procedural safeguards and sufficient evidence, "must inquire whether the rationale of the agency is both discernable and defensible."

### III

With these principles in mind, the court turns to a discussion of the subject regulations.

Article 1149 of the United States Navy Regulations (1973) is as follows:

> 1149. Communications to the Congress.
>
> No person in the naval service shall, in his official capacity, apply to the Congress or to either house thereof, or to any committee thereof, for legislation or for appropriations or for Congressional action of any kind except with the consent and knowledge of the Secretary of the Navy. Nor shall any such person, in his official capacity, respond to any request for information from Congress, or from either house thereof, or from any committee of Congress, except through, or as authorized by, the Secretary of the Navy, or as provided by law.

Article 1148 of the United States Navy Regulations (1973) which is titled "1148. Dealings With Members of Congress" is

---

**4.** The defendant made his motion at the conclusion of the plaintiff's case. However, it should be noted that by stipulation of counsel as to order of proof, the plaintiff testified first, the defendant put on two of his witnesses, the plaintiff rested and then the defendant's motion was made.

exactly the same as 10 U.S.C. § 1034 (1983) both of which state:

No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States.

■ The plaintiff, Banks, maintains that Article 1149 does not apply to him as a Naval Reservist, and therefore his removal as commanding officer of VFA–303, was arbitrary, capricious, whimsical and without legal justification. Banks contends that Article 1149 is unconstitutionally overbroad as it does not apply to Naval Reservists, and that it violates his First Amendment rights under the United States Constitution.

The Secretary insists that the plaintiff was a person within the department of the Navy, and a person within the meaning of Article 1149. Accordingly, the Secretary contends that Banks was required to follow Navy Regulations, that he was responsible for his acts in communicating with Congress, and in so doing violated Article 1149. The Secretary further contends that Article 1149 does not conflict with the First Amendment.

According to Secretary Lehman the rational of Article 1149 is that it is necessary for national security because "there must be an orderly process for policy, debate and disagreement within the executive branch." However, once a decision is made then the official voice as opposed to the private voice should be the one dealing with the Congress. Secretary Lehman is of the opinion that a communication on official stationery without authorization violates good order and discipline in the Navy. (Dep. of Lehman at 48–49, Testimony of Rinard).[5]

The Regulation also effectuates the military's position of neutrality in politics which reflects "a 200–year tradition of

keeping the military separate from political affairs, a tradition that ... is a constitutional corollary to the express provision for civilian control of the military in Art. II, § 2, of the Constitution." *Greer v. Spock,* 424 U.S. 828, 841, 96 S.Ct. 1211, 1219, 47 L.Ed.2d 505 (1976) (BURGER, C.J., concurring). Article 1149 serves the national security by contributing to the effectiveness of civilian control over the military.

Commander Banks had several alternatives open to him in order to express his views. Banks could have sent a letter through the chain of command and/or he could communicate in a private capacity with members of Congress without the use of official Navy stationery.

In the case at bar, Banks used official Navy letterhead, wrote his letter as the Commander of VFA–303, and signed the letter in his official capacity as Commander. It is quite clear that if Congressmen were to receive such letters from various military personnel it would be confusing as to the Navy's official policy.

■ As to the First Amendment concerns raised by the plaintiff, the court is aware that the First Amendment's guarantee of free speech is "not absolute, and that regulation as to time, place and manner of exercise is proper when reasonably related to a valid public interest." *Kannisto v. City and County of San Francisco,* 541 F.2d 841, 842 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977) (citing *Cox v. Louisiana,* 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965)). *See also Breard v. Alexandria,* 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951).

In *Pickering v. Bd. of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court established a balancing of interests test to determine whether the actions of a governmental employer violate the First Amendment. The Court stated that:

---

5. There is one credibility call that the court must make in this case, although the court does not feel it is critical to the decision. Admiral Rinard testified that in December, 1983 or early January, 1984 he advised Banks against writing

a letter to members of Congress in his official capacity. Commander Banks denies that any such advice was given to him. On the credibility call, the court finds Rinard to be more credible on this issue than Commander Banks.

[t]he problem in any case is to arrive at a balance between the interests of the ... [employee], as a citizen, in commenting upon matters of public concern and the interest of the ... [government], as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1734. The Supreme Court in *Connick v. Meyers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) has recognized the difficulty in balancing the public employee's and the government employer's interests. This court also is aware of the opposing interest problem raised by cases such as Commander Banks'.

In distinguishing governmental employers from private employers several cases have held that police forces are paramilitary units, and as such, the departments interest in maintaining discipline, esprit de corps and uniformity are to be given great weight. *See Kannisto,* 541 F.2d at 843, *Jurgensen v. Fairfax County, Va.,* 745 F.2d 868 (4th Cir.1984). The court recognizes that the several branches of the military naturally maintain these same interests.

The Supreme Court in *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), was faced with an Orthodox Jew and ordained rabbi Air Force officer who was ordered not to wear a yarmulke while on duty and in uniform pursuant to an Air Force regulation. The officer argued that the Air Force regulation infringed on his First Amendment freedom to exercise his religious beliefs. In upholding the regulation, the Supreme Court stated:

Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. *See, e.g., Chappell v.*

*Wallace, supra,* 462 U.S. at [296] 300, 103 S.Ct., [2362] at 2365 [76 L.Ed.2d 586 (1983) ]; *Greer v. Spock,* 424 U.S. 828, 843–844, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505 (1976) (POWELL, J., concurring); *Parker v. Levy, supra,* 417 U.S., [733] at 744, 94 S.Ct., [2547] at 2556 [41 L.Ed.2d 439 (1974) ]. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service." *Orloff v. Willoughby, supra,* 345 U.S., [83] at 92, 73 S.Ct., [534] at 539 [97 L.Ed. 842 (1953) ].

*Id.* at 507, 106 S.Ct. at 1313.

The Court in *Goldman* went on to point out that:

Not only are courts " 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have,' " *Chappell v. Wallace, supra,* 462 U.S., at 305, 103 S.Ct., at 2368, quoting Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 187 (1962), but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy. "Judicial deference ... is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981).

In *Goldman* the Jewish Air Force officer was faced with the choice of not wearing a yarmulke and complying with Air Force regulations or wearing the yarmulke and being in violation. Unlike the case in *Goldman* Banks had other avenues open to him to exercise his First Amendment rights. He could have written a letter as a private citizen or circulated a letter through the Navy chain of command.

Banks by writing letters on official Navy letterhead and in his official capacity violated Article 1149 of Navy regulations. Obviously, writing to congressmen about the type of aircraft that will be used by reserve units is a matter of public concern. However, balanced against that is the military's interest in uniformity, esprit de corps and

discipline. Banks had other avenues open to him to exercise his First Amendment rights which he did not utilize. The court feels that the military's interest in uniformity, esprit de corps and efficiency of the Navy outweigh the plaintiff's exercise of his First Amendment rights in this case. The court finds Article 1149 to be a proper regulation as to time, place and manner and reasonably related to valid public interests. Accordingly, the court holds that the regulations are valid and not a violation of the First Amendment.

## IV

### Conclusions of Law

This case involves an actual controversy as to whether the plaintiff's rights as a Naval Reservist, which are protected by 10 U.S.C. § 1034 and the First Amendment, were violated by Article 1149 of Navy Regulations. The court has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202.

The court finds that the plaintiff was a person within the department of the Navy, and a person within the meaning of Article 1149. The court further finds that Commander Banks was required to follow Navy Regulations, that he was responsible for his acts in communicating with Congress, and in so doing violated Article 1149 by communicating in his official capacity.

Plaintiff's transfer was an administrative decision and not a punitive one. It was in accordance with applicable Navy Regulations dealing with Naval officers.

Article 1149 is a proper regulation as to time, place and manner, reasonably related to valid public interests and does not conflict with 10 U.S.C. § 1034 or the First Amendment.

The action of the Secretary of the Navy was not arbitrary, capricious, an abuse of discretion, or contrary to law.

The defendant's Motion to Dismiss should be granted.